UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 24-20201-CR-WILLIAMS

UNITED STATES OF AMERICA,

    *Plaintiff*,

v.

DAVID KNEZEVICH,

    *Defendant*.

_____/

## ORDER GRANTING MOTION FOR RECONSIDERATION OF DETENTION ORDER; SECOND ORDER OF DETENTION

On August 8, 2024, the Court held a second hearing pursuant in the above-styled case to determine whether David Knezevich ("Defendant") should be detained prior to trial after Defendant's Renewed Motion to Reopen Detention Hearing ("Motion"). Having again reconsidered the factors enumerated in 18 U.S.C. § 3142(g), and having found cause to reopen the detention hearing based on material evidence or information not previously known to Defendant, the Court grants the motion for reconsideration. Upon doing so, however, the Court still finds that no condition or combination of conditions will reasonably assure the appearance of Defendant as required. And, most pertinent to the issues raised at the second hearing, the Court finds that there is ample evidence in the record to sustain the Government's burden of showing a sufficient factual basis to charge the Defendant and allow for his detention before trial. Indeed, the evidence produced at the second hearing supports the Court's original finding that the Defendant presents a serious risk of flight given

the cunning level of deception that he has demonstrated as part of the crime he is alleged to have engaged in. Finally, the Court also finds that Defendant's attack on the Government's jurisdiction to charge him in this case, under 18 U.S.C. § 1201(a)(1), is ultimately unavailing. A prima facie case exists on this record for the exercise of United States jurisdiction over this alleged crime. Accordingly, it is hereby **ORDERED** that Defendant shall continue to be detained prior to trial and until the conclusion thereof.

## I.     APPLICABLE LEGAL STANDARD

The policy underlying the Bail Reform Act "is to permit release under the least restrictive condition compatible with assuring the future appearance of the defendant." *United States v. Price,* 773 F.2d 1526, 1527 (11th Cir. 1985) (per curiam). When the United States seeks to detain a criminal defendant pending trial based on his status as a flight risk, it must prove by a preponderance of the evidence that no condition or set of conditions will reasonably assure his presence at trial. *E.g., United States v. Medina,* 775 F.2d 1398, 1402 (11th Cir. 1985) (citing 18 U.S.C. § 3142(f)). Section 3142(f) also provides that:

> The hearing may be reopened, before or after a determination by the judicial officer, at any time before trial if the judicial officer finds that information exists that was not known to the movant at the time of the hearing and that has a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of any other person and the community.

Accordingly, on a reconsideration motion, Defendant is required to establish that a) information exists that was not known to Defendant at the time of the initial detention hearing and b) that such information has a material bearing on the issue

of whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of any other person and the community. *See, e.g., United States v. Gallo*, Case No. 12-20630-CR, 2014 WL 1230717, at *3 (S.D. Fla. Mar. 25, 2014) (quoting § 3142(f)(2)). This burden must be strictly construed. *See, e.g., United States v. Pon*, No. 3:14-CR-75-J-39PDB, 2014 WL 3340584, at *3 (M.D. Fla. May 29, 2014) ("Courts have interpreted that [reopening] provision strictly, holding that reopening is unwarranted if the newly offered evidence was available at the time of the hearing.") (citing *United States v. Dillon*, 938 F.2d 1412, 1415 (1st Cir. 1991) and *United States v. Hare*, 873 F.2d 796, 799 (5th Cir. 1989)).

So in in exercising this strict review, the general standards of reconsideration that govern any Court Order must also be taken into account:

> "[R]econsideration of a previous order is an extraordinary remedy to be employed sparingly." *Burger King Corp. v. Ashland Equities, Inc.,* 181 F. Supp. 2d 1366, 1370 (S.D. Fla. 2002) (citation omitted). "There are three major grounds which justify reconsideration: (1) an intervening change in the controlling law; (2) the availability of new evidence; and (3) the need to correct clear error or prevent manifest injustice." *Id.* at 1369; *see also United States v. Edler,* No. 13-60168-CR, 2013 WL 4543695, at *1 (S.D. Fla. 2013) (applying same factors to motion for reconsideration/rehearing of a detention order).

*Gallo*, 2014 WL 1230717, at *3; *see also United States v. Haynes*, No. 9:19-CR-80045, 2019 WL 5538300, at *2-3 (S.D. Fla. Oct. 28, 2019) (employing the same standard and denying motion to reopen detention hearing).

New and material information "consists of something other than a defendant's own evaluation of his character or the strength of the case against him: truly changed circumstances, something unexpected, or a significant event." *United States v.*

3

*Jerdine*, No. 1:08 CR 00481, 2009 WL 4906564, at *3 (N.D. Ohio Dec. 18, 2009), *aff'd*, 511 F. App'x 391 (6th Cir. 2013).

## II.  ANALYSIS

The Court's original detention order found that a prima facie basis existed for the Government to charge Defendant with kidnapping in violation of 18 U.S.C. § 1201(a)(1). The Government initially proffered as follows:

> On or about December 26, 2023, the Defendant's wife, a 40-year-old female and United States citizen (the "Victim") flew out of Miami International Airport to Madrid, Spain. Thereafter, on February 2, 2024, the Victim's friends and family, who had previously communicated with her while she was in Spain, lost contact with her. Spanish authorities were alerted to the Victim's disappearance by one of her friends after the Victim failed to show up for a previously planned trip to Barcelona. The last non-automatic activities on the Victim's Bank of America account were for a flower purchase on February 2, 2024, the day she was last seen entering her apartment, as well as a charge from a restaurant in Madrid on February 10, 2024, for failing to show up to a dinner reservation that she had previously made.

> On February 4, 2024, Spanish firefighters entered the Victim's apartment for a welfare check and discovered that she was not in the apartment. Subsequently, Spanish law enforcement searched the Victim's apartment pursuant to a court order and discovered that her cell phone, laptop computer and respective chargers were missing. At the time of her disappearance, the Victim was married to the Defendant, a Yugoslavian-born naturalized citizen of the United States. According to the Victim's friends and family, the Victim and the Defendant were separated and planned to divorce. The separation was contentious because the Defendant did not want to split the marital assets evenly with the Victim. The Victim was very fearful of the Defendant.

> An investigation into the Victim's disappearance by Spanish authorities revealed that on February 2, 2024, the security camera at the Victim's apartment building in Madrid captured her entering the building around 1:42 p.m. This is the last time she has ever been seen. The same day, at approximately 9:27 p.m., the building surveillance camera captured a male, believed by law enforcement to be the Defendant, waiting outside the entrance to the Victim's apartment

building. The male is wearing a motorcycle helmet, a reflective vest, dark pants and gloves and is holding a white plastic bag giving the impression that he is a food delivery service provider. As two women exit the building, the male uses the opportunity to enter the building. He remains downstairs briefly outside of the video surveillance cameras and then proceeds to go up the stairs.

A short time thereafter, the male is captured descending the stairs while holding a can of spray paint with a strip of duct tape now affixed to the chest of his vest. The male sprayed the lens of the surveillance camera with the spray paint to disable it. The male then returns to the front door that he entered the building through, pauses for a moment, seemingly to fasten a piece of duct tape to the lock to prevent the lock from engaging to allow subsequent entry to the building, and then exits the front door of the apartment. At approximately 9:52 p.m., the male reenters the apartment building and appears to enter the elevator with an object. Based on the movement of the object, its proximity to the male and its shape, it appears to be a rolling suitcase. The male then leaves the elevator with the suitcase at approximately 9:55 p.m.

Based on the surveillance footage, Spanish authorities were able to identify the brand of spray paint used to disable the security camera. Law enforcement then determined that a retailer in Madrid had reported a sale of that particular brand of spray paint on February 2, 2024, the same day the Victim is last seen. Surveillance footage from the retailer clearly depicts the Defendant purchasing the spray paint along with two rolls of duct tape in cash on February 2, 2024, around noon.

Additionally, a Columbian woman, who the Defendant met on a dating app in October of 2023, advised law enforcement that on February 3, 2024, the day after the Victim is last seen, the Defendant contacted her via WhatsApp and asked her for help in translating a message into, quote, "perfect Colombian" for a friend in Serbia is writing a script about a Colombian character. Notably, the Victim in this case was born and raised in Colombia and is fluent in Spanish. She later became a United States citizen. The individual then translates two messages for the Defendant.

The first message stated, "I met someone wonderful, he has a summer house about two hours from Madrid. We are going there now and I will spend a few days there. There is barely a signal though, I'll call you when I come back. Kisses." The second message stated, "Yesterday after therapy I needed a walk and he approached me on the street. Amazing connection, like I never had before." Those

5

messages are the last messages that family and friends received from the Victim. The messages were sent from the Victim's phone on February 3, 2024, the day after she is last seen entering her apartment building. Law enforcement has no reason to believe that the Victim or this Colombian woman ever knew one another. The only connection between the Victim and the Colombian woman is the Defendant.

Records from Customs and Border Protection revealed that on January 27, 2024, the Defendant traveled by airplane from Miami International Airport to Istanbul, Turkey. He subsequently traveled out of Serbia into Croatia by a vehicle via a border crossing on January 30, 2024, and returned to Belgrade, Serbia from Croatia by vehicle also through border crossing on February 5, 2024. The Defendant rented a Peugeot 308 (a vehicle) in Serbia from on or about January 29, 2024, through on or about March 15, 2024. When the Defendant returned the vehicle, the windows had been tinted, there was an indication that the license plates had been -- the license plate frames had been changed, and two stickers had been removed from the vehicle. The vehicle had traveled approximately 7,677 kilometers while in the Defendant's possession.

Spanish authorities also advised that around the relevant time, which is approximately February 1 to February 2, 2024, an individual filed a complaint that both of his license plates were stolen off of his vehicle in Spain. Spanish authorities ran a search in their plate reader database for that stolen plate and learned that the plate was present on the street where the Victim's apartment was located. The stolen plate passed through two tollbooths in the middle of the night on February 2, 2024, into February 3, 2024. Video from the tollbooths revealed that the plates were attached to Peugeot 308 with tinted windows, which is the type of vehicle that the Defendant rented in Serbia. Because of the tint, the driver is not visible. One of the tollbooths was in a town which is just outside of Madrid.

More license plate readers positioned the stolen plates within a four-minute walk of a motorcycle accessory shop in Madrid on February 2, 2024. Around the same time the vehicle was located there, an individual bought a motorcycle helmet and a reflective vest at the store in cash at approximately 5:10 p.m. The helmet purchased is the same brand of helmet, make and model, if you will, that the Defendant wore while spray painting the surveillance cameras in the Victim's apartment.

> Additionally, the Defendant's Facebook account used an IP address in an area of Spain just north of Madrid on February 1, 2024, the day before the Victim's disappearance. The Defendant was born in Yugoslavia, as noted in the Pretrial Services report. He's traveled to over 30 countries, most recently Serbia where he remained until he flew into Miami International Airport on Saturday May 4, 2024, and at that point he was arrested.

[D.E. 43-1 at 3:1-8:18].

The facts set forth in this proffer certainly support a prima facie case, sufficient for detention purposes, that the Government could satisfy its burden to show that Defendant engaged in a kidnapping of his estranged wife after engaging in interstate or foreign commerce. Indeed, a grand jury has now found probable cause to indict Defendant for this offense. In sum, he travels to his home country, Serbia through Turkey from Miami a week before his wife is found to be missing. He gets to Serbia, where he rents a car. He then drives to Spain where he is seen on video buying unusual items from a hardware store while wearing what appears to be a jacket with reflective tape and carrying a motorcycle helmet. Later that day, a mysterious man wearing a motorcycle helmet enters the apartment building where the wife is living in Spain. Shortly thereafter the man appears to paint over the surveillance camera located on the lobby floor. Minutes go by and the image of a man appears to be seen leaving the building. Not coincidentally, Defendant's wife is never seen or heard from again.

Perhaps these facts were merely coincidental. But when we later learn that Defendant is coercing someone to translate text messages purportedly sent by his wife, which purport to explain why the wife is going to be out of touch for a while, then that suspicious coincidence becomes real circumstantial evidence that

7

Defendant was involved in, at minimum, a kidnapping of his estranged wife. He was buying those supplies in that hardware store, including the can of spray paint, to make sure the video cameras did not catch him moving her out of the building. He was engaging in a scheme to make it look like the wife was alive and well, communicating with her friends about a man she just met, when in fact she was never to be seen again.

To boot, law enforcement later learns that he drove the rented car all the way back to Serbia from Spain in a rental car that he rented for a total of 47 days. Even more oddly, he returns the vehicle in an altered state. Identifying stickers had been removed. The windows had been tinted. The vehicle was driven well over seven thousand kilometers (travelling to Croatia, then France, then Spain and back to Serbia). All these facts in combination reflect highly unusual behavior for someone with the means to fly from Serbia to Spain if he wanted to visit a hardware store in Madrid. And let there be no doubt that any objective review of the video from that hardware store evidences this Defendant at that store in Madrid buying those incriminating items. At a time he was supposed to be visiting his family in Serbia, he was blocks away from the apartment where his wife was last seen.

### A. *<u>The Newly Discovered Evidence is Not Material</u>*

These were all facts proffered by the Government at the initial detention hearing. Defendant's motion to reopen the detention matter, however, was focused on specific information the testifying Agent provided during the hearing. First, the Defendant argues that the Agent's testimony regarding blood at the crime scene was totally disproven. In answers to the Court's and defense counsel's questions, the

8

Agent alluded to possible blood evidence that had been found inside the apartment that was being tested. After the hearing, the Government learned from Spanish authorities that the material tested did *not* in fact reveal any blood evidence.

Defendant's motion made this purported contradiction out to be a highly significant fact that totally undermined the Court's basis for detention. Yet, notably the Government had not cited this evidence in its proffer because, at the time of the detention hearing, the Government did not possess results of the Spanish authorities' forensic examination of the kidnapped woman's apartment. As such, the government did not include any reference to blood evidence in its proffer to the Court or in its argument. Likewise, the Government did not allege there was any blood found in the victim's apartment in the sworn Complaint. [D.E. 3]. Consequently, the Court's Order of Detention makes *no* reference to any blood being found in the Victim's apartment. [D.E. 17]. The Court understood that matter to be inconclusive and relied instead on the facts proffered by the Government that had been substantiated.

So, rather than supporting the Defendant's cause, the "newly discovered" evidence the motion relies on, supports the reliability of the Government's original proffer. But at a minimum, it is not consequential because the Court clearly did not rely on the Agent's reference to possible blood evidence in making the finding that sufficient probable cause existed to sustain a conviction and thereby support a detention order before trial.[1] Hence, this clarified information about the forensic

---

[1] We note here that Defendant also makes more of the contradiction than the record supports. The Agent testified that blood evidence was found but also made clear that no reference was made to that fact in the complaint because the evidence had not yet been tested. And the Agent conceded that she was clearly relying on hearsay (based on what she heard from Spanish law enforcement officers) that blood

testing results does not constitute material new information to sustain reconsideration of the Order of Detention.

Second, Defendant's motion focused on what Defendant argues to be discredited evidence with respect to the video surveillance footage. Citing FBI reports describing "grainy video footage from a surveillance camera depicting a man with similar features as [Knezevich] entering the apartment with a suitcase at approximately 10 p.m.," Defendant argues that newly discovered information undermines the Government's initial claims that Defendant could be seen on the video at the apartment building where the victim was staying. But again, Defendant makes much of this newly discovered concession, but it too does little to undermine the thrust of the Government's proffer.

The Government's proffer did not refer to a grainy video depicting a man with similar features to the Defendant. Rather, it referred to a "male, believed by law enforcement to be the defendant" depicted on the surveillance footage and explained the basis for that belief. [D.E. 43 at 3:1-8:18]. The Court did not have the benefit of that surveillance evidence during the hearing but has now reviewed those videos in advance of the hearing on this motion. The Court agrees that the video of the mysterious man at the apartment building cannot definitively be characterized as the Defendant, solely from a review of that evidence in isolation. The Government points to similar reflective tape featured on the man that could also be seen on Defendant when he was buying the items at the hardware store. And, to be sure, the man

---

evidence may have been found. The Court thus did not rely on unverified speculation or hearsay in its detention Order.

10

depicted in that earlier video is most definitely Defendant. So the Government is certainly drawing an inference that the same man was present at the apartment building. But we cannot say for sure, of course, that a reasonable juror will agree.

But that is not the standard that we must apply. We need not determine that Defendant's guilt will be determined beyond a reasonable doubt. That is what a trial is for. We are only finding that sufficient evidence exists to allow the Government to make that claim before the jury, and to assure that the Defendant will be present for that trial. The Defendant's assessment of the strength of the evidence in his case in not a basis to reconsider the Order of Detention.

The same is true with Defendant's claim that the evidence pertaining to a Serbian license plate is "speculative" evidence. After the Detention Hearing, FBI personnel learned that a license plate was stolen in Belgrade, Serbia ("Stolen Plate"), on January 28, 2024, the day the Defendant arrived in Belgrade from Miami, Florida. Thereafter, license plate readers recorded the Stolen Plate traveling from France towards Madrid, Spain, on February 1, 2024 (the day prior to the victim's disappearance). Spanish law enforcement also determined that the Stolen Plate was moving parallel to the Serbian telephone the Defendant used during his kidnapping. This information is documented in a report authored by the Spanish National Police that has been produced in discovery.

Again, even if characterized as new evidence it is not a basis to reconsider the Court's Order of Detention because it is, at best, further inculpatory. The additional information gathered by the Government further bolsters its case that the Defendant engaged in a scheme in foreign commerce to travel to Spain, from the United States,

11

while masking his presence in Spain to avoid incriminating himself in the disappearance of his estranged wife.

We also note here that all the evidence the Court has considered in the detention matter comes from the Government. Defendant of course has a right to remain silent. But a hearing on a detention motion need not be one-sided; a defendant always has the opportunity to proffer her own facts to the Court or provide sworn testimony from an alibi witness. Here, Defendant has had two hearings on the detention matter. At neither hearing has Defendant proffered any alternative evidence to suggest that the Government's case is fatally flawed. To the contrary, Defendant has conceded that he traveled to Serbia at the relevant time, flying through Turkey. But that is it. So the Court has only the Government's evidence to consider along with this concession. That evidence is sufficiently damning to support a prima facie basis to detain the Defendant pending trial.

Again, the Court's decision to detain, as in all cases, does not come down to whether or not the Court believes the Defendant will be found guilty. Surely, this is a highly defensible case because at this point the Government is relying only on circumstantial evidence of the kidnapping and Defendant's role in that crime. All circumstantial evidence cases are defensible, but a detention decision is supposed to focus on the finding as to the Defendant's presence at trial. As to that score, the evidence presented at the first hearing is largely the same as the evidence we have now. The Defendant has extraordinary foreign ties, has financial means to sustain flight, and has the motivation to do so given his efforts to date at hiding his involvement in this crime. All those factors strongly support the Government's

argument that Defendant poses a serious risk of flight. That finding remains undisturbed notwithstanding Defendant's efforts to undermine or discredit the Government's case or the bona fides of the Government's lawyers.[2]

### B.  *No Reconsideration is Warranted for Lack of Jurisdiction*

Finally, Defendant asserted a renewed attack on the Court's jurisdiction over this case. Defendant points out that Spanish authorities have not charged him with either kidnapping or murder. And Spain should be the focus of the prosecution inquiry given that the alleged crime took place in that foreign jurisdiction. Defendant thus concludes that the Government's basis for exercising jurisdiction over this case fails.

Even if this issue was appropriate for the Court to consider at the bond stage of a case, the Court cannot ignore the presumption that where as here the Indictment tracks the language of the statute it is prima facie valid. *See* 18 U.S.C. § 1201(a) (providing that "[w]hoever unlawfully seizes, confines, inveigles, decoys, kidnaps,

---

[2] We note that additional facts learned after the initial hearing further support the Court's finding of serious risk of flight. Despite the Defendant advising Pre-Trial Services that he "relinquished his Serbian citizenship" and suggesting that he was not a dual citizen, and further that his Serbian passport was expired, the Government has proffered that the Republic of Serbia has informed it that the Defendant "is a citizen of the Republic of Serbia and has a passport . . . issued by the police department of the city of Belgrade, with an expiration date of 09/17/2032." *See* Exhibit 4. [D.E. 52-2]. Moreover, the owner of an apartment the Defendant was renting in Serbia prior to his arrest took a photo of the Defendant's Serbian passport that he found in the apartment after the Defendant was arrested. That photo was provided to law enforcement in June 2024. [D.E. 54]. The Government believes that the owner later turned over Defendant's passport to his parents at their request. Yet, the passport was not found when Serbian law enforcement searched the Defendant's parents' home later that month. These is all material information that only underscores the Court's finding of a serious risk of flight.

abducts, or carries away and holds for ransom or reward or otherwise any person . . . when . . . *the offender travels in interstate or foreign commerce*" commits the offense of kidnapping). The Grand Jury's finding is not subject to factual challenge before trial, and certainly not in opposition to a detention motion. *See, e.g., United States v. Critzer*, 951 F.2d 306, 307 (11th Cir. 1992) ("There is no summary judgment procedure in criminal cases. Nor do the rules provide for a pre-trial determination of sufficiency of the evidence. Moreover, this court is constitutionally barred from ruling on a hypothetical question. The sufficiency of a criminal indictment is determined from its face. The indictment is sufficient if it charges in the language of the statute.").

But even if we did analyze the issue as part of the Court's obligation to assure a sufficient prima facie case can be made for the exercise of jurisdiction, we note that its analysis "must begin, and usually ends, with the text of the statute." *United States v. Stevens*, 997 F.3d 1307, 1314 (11th Cir. 1995). "If the statute's meaning is plain and unambiguous, there is no need for further inquiry." *Id.* (citing *People for the Ethical Treatment of Animals, Inc. v. Miami Seaquarium,* 879 F.3d 1142, 1146 (11th Cir. 2018) (internal quotations omitted).

In relevant part, 18 U.S.C. § 1201(a)(1) provides the Government jurisdiction over seizures, abductions, and kidnappings that occurred extraterritorially when "the offender travels in interstate or foreign commerce… in committing or in furtherance of the commission of the offense." Thus, the United States holds the ability to prosecute foreign kidnappings, so long as the offender travelled in foreign commerce (i.e. originally from the United States), which is the only jurisdictional hook provided by the statute.

14

Defendant nonetheless argues that the Government has failed to proffer sufficient evidence that he travelled from Miami to Serbia in furtherance of his alleged kidnapping of his wife in Spain to be charged under §1201(a)(1). Defendant principally relies on a Fifth Circuit case, *United States v. Meyer,* 63 F.4th 1024, 1033-36 (5th Cir. 2023), to support his claim that the evidence presented by the Government creates too attenuated a connection between his travel and the subsequent kidnapping of his wife to establish jurisdiction under §1201(a)(1).

We read that case very differently. In *Meyer*, the Fifth Circuit upheld the defendant's conviction under 18 U.S.C. § 1201 despite the challenge to the Court's jury instruction on the issue, as well as the sufficiency of the evidence to sustain the jury's finding and conviction. There a defendant travelled to Mexico from Texas for the purpose of comforting and making at ease the eventual victims of a kidnapping scheme, all in order to facilitate their kidnapping committed by defendant's drug-trafficking associates. *Id.* While *Meyer*'s factual background similarly revolved around violations of § 1201, the Fifth Circuit's ruling never purports to establish or even contemplate temporal and/or spatial limits on §1201(a)(1)'s jurisdictional hook, contrary to Defendant's suggestion. And of course the holding of the case rejected that defendant's challenge to the application of the statute. *Id.* at 1033-36.

Here, the case for jurisdiction is stronger. The Government's evidence supports a finding that Defendant's travel from Miami to Turkey was the first leg of a multi-layered kidnapping scheme, which was an essential component of the scheme to hide Defendant's ultimate presence in Spain. Moreover, while in Spain he used instrumentalities of commerce (i.e. a rental car and his phone) in furthering his

15

criminal offense. If proven, these allegations are amply sufficient for jurisdiction to attach under the statute. In light of this, Defendant's argument for lack of jurisdiction fails under a plain reading of the relevant statute. Based on the record provided, Defendant travelled from the United States to Serbia in furtherance of his alleged kidnapping of his wife in Spain. He used various instrumentalities of commerce to further his scheme. And section 1201(a)(1) does not establish a rigid temporal or spatial standard when determining if the offender traveled in furtherance of the crime, nor does it create an attenuation test. No authority has been cited to directly support Defendant's construction of the statute. Thus, there is at least a prima facie case to be made that jurisdiction lies under this statute.

### III.    CONCLUSION

Pursuant to the Court's original findings, as well as the new and supplemental information provided through the briefing on this motion and the second detention hearing, the Court hereby grants the motion for reconsideration but also Orders that:

a. Defendant be detained without bond;

b. Defendant be committed to the custody of the Attorney General for confinement in a corrections facility separate, to the extent practicable, from persons awaiting or serving sentences or being held in custody pending appeal;

c. Defendant be afforded reasonable opportunity for private consultation with counsel; and

d. On order of a Court of the United States, or on request of an attorney for the government, the person in charge of the corrections facility in which Defendant

16

is confined shall deliver Defendant to a United States Marshal for the purpose of an appearance in connection with any court proceeding.

**DONE AND ORDERED** at Miami, Florida, this 9th day of September, 2024.

*/s/ Edwin G. Torres*
EDWIN G. TORRES
United States Magistrate Judge