UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 24-cr-20201-KMW

UNITED STATES OF AMERICA,

v.

DAVID KNEZEVICH,

     Defendant.

_____/

## RENEWED MOTION FOR BOND

David Knezevich ("Knezevich"), through his undersigned counsel, pursuant to the Bail Reform Act (18 U.S.C. § 3141, *et. seq*.) and the fundamental rights guaranteed by the Fifth Amendment ("No person shall be … deprived of life, liberty, or property, without due process of law"), Sixth Amendment ("In all criminal prosecutions, the accused shall enjoy the right to a speedy … trial …"), and Eighth Amendment ("Excessive bail shall not be required"), respectfully submits this Renewed Motion for Bond.

### I.    INTRODUCTION

Knezevich has been detained without bond since his arrest at Miami International Airport on May 4, 2024. Knezevich's trial is now set for June 19, 2025, following the granting of the Government's Motion to Continue Knezevich's February 10, 2025 trial date. (D.E. 140). Depending upon the Government's compliance with its discovery and *Brady* obligations, the earliest Knezevich's case will be brought to trial is June 19, 2025, which will be thirteen-and-one-half months since Knezevich's arrest and detention.

At the time of Knezevich's arrest, he was returning to the United States after being contacted by federal law enforcement for questioning and having been identified as the prime

suspect in the February 2024 disappearance of his wife. Despite the Government's investigation into Ana Knezevich's disappearance being incomplete, the Government decided on May 4 to initiate Knezevich's "reactive arrest" based on the Government learning that Knezevich, a Broward County resident and United States citizen, would be arriving in the United States. Knezevich was charged with kidnapping in violation of 18 U.S.C. 1201, which the Government knew it could not prove.[1] The Government followed its "reactive arrest" decision, with an application for pretrial detention based upon Knezevich's alleged danger to the community and risk of flight. Chief Magistrate Judge Torres ("Chief Magistrate Torres") rejected detention based on danger to the community, but ordered detention based on risk of flight. Chief Magistrate Torres described the detention decision as a "close call."

Neither Chief Magistrate Torres nor this Court was told when determining Knezevich's pretrial detention that the Government's decision to arrest Knezevich on kidnapping charges upon his arrival in the United States was a "reactive arrest." Likewise, the Government failed to inform the Court that the Government actually intended to charge Knezevich with the murder of Knezevich's wife, but due to only ninety days having passed since the alleged disappearance of Knezevich's wife, the Government needed to delay bringing Knezevich to trial on murder charges until additional time had elapsed. Both Chief Magistrate Torres and this Court in considering the Government's detention application were never informed that the Government would not realistically be bringing Knezevich to trial for at least a year, and the charge of kidnapping was nothing more than a placeholder for the Government's planned murder charges. Had the

---

[1] At the first detention hearing, FBI Special Agent Montilla ("Agent Montilla") testified that the Government did not have any evidence that the victim was held against her will for an appreciable amount of time, as is required by 18 U.S.C. § 1201. *See* **Exhibit A**, transcript from first detention hearing on 5/10/24, at 30.

Government been fully transparent in requesting Knezevich's detention, Chief Magistrate Torres and this Court would have been able to determine the appropriateness of detaining an American citizen without bail where the filed charges where merely a placeholder for other charges and the requested pretrial detention was an "investigative detention."

Knezevich's "reactive arrest" resulted in him being forced to prepare his defense against inaccurate facts and Government conclusions that are unsupported by any evidence. The Government has never been ready for trial in this case and assigns the blame in large part on delays in obtaining MLATs from foreign countries. The truth is, the Government has not been ready for trial because it was still investigating the case when it arrested Knezevich on May 4, 2024, and it *continues to investigate to this day* despite the defense's best efforts to conclude discovery and go to trial. *See, e.g.,* Knezevich's motions for discovery cut off, to compel production, and opposition to continuance. (D.E. 81; D.E. 125; D.E. 124).

*Notably, the Court suggested on the record that if trial in this matter was delayed more than a year beyond Knezevich's initial appearance, and if delays and impediments extended the life of the case out beyond what is permitted by speedy trial, it would examine the impact of detention on the defense and potentially be willing to revisit bond.[2] Given that trial was just pushed to June 2025, over Knezevich's objection, this renewed application follows*.

## II.    PRIOR DETENTION PROCEEDINGS

On May 10, Chief Magistrate Torres held a pre-trial detention hearing and issued an order detaining Knezevich pending trial ("Detention Order" at D.E. 17), although the Court stated on the record that the case was "***a close call***" he recognized that it is a completely circumstantial

---

[2] Ex. D at 16:7-22; 35:1-14.

case.[3] Chief Magistrate Torres specifically found that even considering the evidence in a light most favorable to the Government, Knezevich was *not* a danger to the community. (Ex. A at 46); (D.E. 17 at 2). Chief Magistrate Torres further stated on the record that if Knezevich's means of travel were taken away, his risk of flight would be ameliorated. (Ex. A at 43). Nonetheless, at the Government's insistence that Knezevich had substantial means and would flee, Chief Magistrate Torres ordered Knezevich be detained based on risk of flight.

Knezevich moved to re-open the detention hearing after learning substantial, new information in discovery that bore on risk of flight factors and showed that several of the Government's representations in the first detention hearing were false. (D.E. 43) This included:

- Contrary to testimony at the first detention hearing from Agent Montilla, there was no blood found at the alleged crime scene, nor was there any forensic testing confirming the presence of blood.

- There was no evidence that Ms. Knezevich was taken against her will or held for an appreciable period, which are essential elements of the crime of Kidnapping.

- Contrary to the Government's allegations, there was no CCTV video footage of a man with similar characteristics to Knezevich spray painting outside the apartment building on the day his wife disappeared.

- Contrary to Government's allegations that Knezevich was seen going in and out the apartment building with a suitcase, or what appears to be a suitcase, the purported evidence for this claim is a completely undecipherable video that shows no such thing.

- Contrary to the Government's allegations, proffer, and testimony that Knezevich accessed his Facebook near his wife's apartment the day before she went missing, there was scant evidence of that, and given that the login appeared to be from the IP address for Ms. Knezevich's apartment, it was just as likely that the login was done by Ms. Knezevich herself.

Given the foregoing, Chief Magistrate Torres re-opened the matter for a second detention hearing on August 8, 2024. (D.E. 56). Critically, the Government did not refute that Knezevich

---

[3] Ex. A at 48:4-5; 51:3-6 (emphasis added).

returned to the United States voluntarily despite knowing his status as the prime suspect in his wife's disappearance. In addition, beyond the merits of detention, <u>it became apparent during this second detention hearing that the Government was not prepared to go to trial within 70 days, and the Kidnapping charge was a mere placeholder.</u> During the hearing, defense counsel raised the issue of speedy trial, and the impact the Government's delay was having on Knezevich's constitutional rights:

> So, when I get 10,000 pages of reports from the Spanish National Police, but it is written by the FBI as he is captured on the CCTV video outside her apartment building, well, that's a concern. **As the Court said last time, well, maybe you want to ask for a speedy trial so he is not detained so long. And that would be great, but *how could I possibly do that? Look what we found out in a month*.**[4]

Despite all the foregoing, the Court ordered Knezevich remain detained based on risk of flight. Thus, the Government successfully used its placeholder Kidnapping charge to keep Knezevich detained, while it continued to search for evidence to support the capital charges it always intended to bring.

Finally, in November 2024, after seven months of keeping Knezevich detained and then facing an imminent trial on the Kidnapping charge it could not prove, the Government secured a three count Superseding Indictment charging Knezevich with murdering his wife. Knezevich has been detained since <u>May 4, 2024</u>, and unless bond is given, will be in detention for over thirteen and a half months before he is brought to trial in June 2025.

---

[4] *See* **Exhibit B**, transcript from second detention hearing on 08/08/24, at 83-84 (emphasis added). In this quotation, defense counsel was referring to the above misrepresentations from the previous detention hearing which came to light during the August 8 hearing.

### III.    MEMORANDUM OF LAW

A finding of "risk of flight" requires more than evidence of the commission of a serious crime and the fact of a potentially long sentence. *United States v. Kaplowitz*, No. 14-20323-CR, 2014 WL 2155231, at \*5 (S.D. Fla. 2014) (citing *United States v. Friedman*, 837 F.2d 48, 50 (2d Cir.1988), among others). Mere "theoretical opportunity for flight" is insufficient for pretrial detention. *United States v. Giordano*, 370 F.Supp.2d 1256, 1258-59 (S.D. Fla. 2005). "Even if such speculation were indulged in, conditions of release may certainly be fashioned to guard against this possibility." *Kaplowitz*, at \*5.

The Bail Reform Act was designed to permit release under the least restrictive conditions compatible with assuring the future appearance of the defendant in court. *Kaplowitz*, at \*4 (citing *United States v. Price*, 773 F.2d 1526, 1528 (11th Cir.1985)). Release should only be denied in rare instances, and all doubts regarding release should be resolved in favor of defendants. *Kaplowitz*, at \*4 (citing *Motamedi*, at 1405); *see also United States v. Ali*, No. 05-cr-936, 2005 WL 3115876, at \*2 (N.D. Ill. Nov. 18, 2005) ("Consistent with the most fundamental principles on which this Nation is based, the Bail Reform Act's overriding preference for liberty ensures that pretrial detention will occur only in the rarest of circumstances."); *United States v. Rangel*, 318 F.Supp.3d 1212, 1217 (E.D. Wash. 2018) ("The [Bail Reform Act] makes clear that only in rare cases should release be denied, and doubts regarding the propriety of pretrial release are to be resolved in favor of the defendant.") (internal quotations omitted).

The defense posits that pretrial detention in excess of one year, caused primarily by the Government's delay, violates Knezevich's constitutional rights and requires his release on a reasonable bond. Interestingly, all the cases cited by the Government in its reply in support of the

recent trial continuance, (D.E.128 at 2),[5] involved defendants who had been detained for a year or more pre-trial. But <u>unlike</u> Knezevich, every one of those defendants was found to be a danger to the community. Indeed, one of the cases cited by the Government—*Daniels*—involved a fugitive. That is hardly the situation here, where Knezevich, knowing he was a prime suspect in an open FBI investigation into the disappearance of his wife, voluntarily returned to the United States.

In *Bloate*, the Supreme Court held that delays caused by the Government's failure to provide timely discovery may not be automatically excludable unless the court makes specific findings that the ends of justice served by the delay outweigh the defendant's and public's interest in a speedy trial. *Bloate v. United States*, 559 U.S. 196 (2010). Delays caused by the Government's failure to provide timely discovery *should not* be counted as excludable time against a defendant, particularly when the defendant is in pre-trial detention.

Here, the Government is responsible for all the delays in this case, resulting from its decision to make a "reactive arrest" of Knezevich without being ready to go to trial in 70 days. ***None of the delays are attributable to Knezevich***. Ironically, the lead case cited in the Government's Motion for Continuance discusses Government delay in the context of speedy trial. *U.S. v. Schlei*, 122 F.3d 944, 987 (11th Cir. 1997). Length of delay is one factor for the Court's consideration in determining whether there has been a deprivation of the defendant's Sixth Amendment right. *Id.* at 533. Of crucial importance here, *Schlei* expressly recognized that Government actions which are "tangential, frivolous, dilatory,[6] or taken in bad faith *weigh heavily* in favor of a finding that a speedy trial violation occurred." *Schlei*, at 987 (emphasis added).

---

[5] Citing United States v. Daniels, et al., Case No. 23-CR-20431-ALTMAN, United States v. Singh, et al., Case No. 23-CR-20483-ALTMAN, and United States v. Mentor, et al., Case No. 11-CR-20351- GRAHAM.

[6] According to Black's Law Dictionary, "dilatory" means intending or tending to cause delay, gain time, or put off.

## ARGUMENT

I.  **THE GOVERNMENT'S DELAYS, WHILE IT CONTINUES TO INVESTIGATE AND GATHER EVIDENCE, VIOLATE KNEZEVICH'S DUE PROCESS RIGHTS AND HIS RIGHT TO A SPEEDY TRIAL**

From the inception of the case, the Government has failed to recognize its obligation to ensure Knezevich receives a fair and speedy trial with all the constitutional protections of due process and associated rights guaranteed to him. For example (and there are many others), Knezevich has requested Government assistance for the defense to access the alleged crime scene in Madrid <u>since May 2024</u>. In response, the Government took the position that it had absolutely no obligation whatsoever to assist Knezevich or the defense pursuant to Rule 16. <u>The Government told Knezevich to retain counsel in Spain and ask the Spanish courts for assistance.</u> Knezevich sought relief from the Court on the Government's position, and on September 11, Chief Magistrate Torres ordered the Government to take steps to assist the defense with accessing the alleged crime scene. (D.E. 71).

Incredibly, it took several months for the Government to obtain limited approval for the defense to visit just the apartment building. And this was only after the Government steadfastly argued for months that it was not required under applicable rules to assist the defense in visiting the crime scene in another country. As of the date of this filing, nine months after his arrest and detention, the Government is still waiting on approval for the defense to visit the apartment itself, and it has not discussed scheduling in any constructive manner, despite repeated requests from counsel, and the Court ordering it to do so.[7] Moreover, while the Government has announced its intention to take depositions of witnesses in Serbia, and that it would like to visit Madrid and take those depositions in the same trip, it still has not filed a motion for approval to take the depositions

---

[7] *See* **Exhibit C**, transcript from case management conference on 12/19/24, at 13.

even after the Court suggested that the Government file that motion by the first week of January. (Ex. C at 16).

The continuances in this case have *all* been premised on the Government's failure to obtain and provide discovery.[8] On December 18, the Government filed its Motion for Continuance. (D.E. 121). That Motion relies substantially on a report of excludable time for speedy trial purposes, filed earlier the same day. (D.E. 120). Even where the defense has participated in requesting continuances, it has <u>always</u> been because the Government forced Knezevich to make a Hobson's choice between joining in requesting a continuance to obtain discovery or going to trial without being able to provide effective assistance of counsel. Therefore, it is highly disingenuous for the Government to now claim that this is all excludable time under the Speedy Trial Act. In *Bloate, supra,* the Court made it clear that the defense taking a continuance should not automatically translate into excludable time. Obviously, this is the position that Knezevich now finds himself.

II.      THE DELAYS IN THIS CASE ARE A RESULT OF THE GOVERNMENT MAKING WHAT IT HAS ADMITTED WAS A "REACTIVE ARREST" OF KNEZEVICH BEFORE IT WAS READY TO PROCEED TO TRIAL

The facts surrounding Knezevich's arrest and detention are critical. The Government admits it made a "reactive arrest" of Knezevich before it was ready to try this case. This came about because the Government was surprised Knezevich voluntarily returned to the United States given his status as the prime suspect in his wife's disappearance, and it desired to arrest him before he returned home to Serbia. The Government now readily concedes this. Upon this "reactive arrest," the Government entered a placeholder charge of Kidnapping against Knezevich, *knowing*

---

[8] Still, the Government has not complied with its obligations under Rule 16 pertaining to expert disclosures or <u>Brady</u>, as addressed in (D.E. 125).

it could never prove that offense. This placeholder charge started the speedy trial clock. Regarding

the "reactive arrest" and the Government's delay, this Court noted:

> COURT: . . . it seems to me that every time this case is before me the goal posts have shifted. . . Generally, I did not view "reactive" as someone who knows about an investigation and is returning to the United States.[9]
>
> . . .
>
> OBENAUF: . . . we had to make a decision. And so we made an arrest that perhaps **we were not going to make on that date but for his return on that date**. . . I referred to it as a reactive arrest, which then **set into motion this timeline that would not have otherwise occurred but for his return to Miami**.[10]
>
> COURT: Well, **no . . . there were a host of possibilities**. . . You, Government, made the decision that you did at the time that you did, and so he's pretrial detained. **So, now I am being told, well, it could be a year – which I did not know that – and frankly, that is a problem.**[11]
>
> COURT: . . . Doesn't OIA understand what speedy trial means? **Why isn't everyone on DEFCON 5 moving this along? While I know the wheels of bureaucracy run slowly, a couple of weeks; I mean, come on.**[12]
>
> . . .
>
> COURT: **And so to just say, it will be at least two weeks is not really acceptable. If what you're asking for is so critical to your case why aren't these other Government entities, including your own, why aren't they acting with more dispatch.**[13]

The Government's subsequent discovery failures, which have been the primary cause of

the delays in this case, are a natural consequence flowing from the "reactive arrest" of Knezevich.

---

[9] *See* **Exhibit D**, transcript from 10/22/24 hearing, at 11:4-6 (emphasis added).

[10] Ex. D. at 12:1-6 (emphasis added).

[11] Ex. D at 12:8; 22-25 (emphasis added).

[12] Ex. D at 13:18-22 (emphasis added).

[13] Ex. D at 14:1-5 (emphasis added).

These discovery failures, which have hampered Knezevich's ability to investigate and prepare a defense to the charges, are numerous. They include, but are not limited to:

- Failing to timely issue MLATs for discovery that the Government knew or should have known were necessary to prosecute this case.

- Blindly relying on misrepresentations by the Spanish National Police ("SNP") that the SNP had given the Government all relevant evidence, which has turned out to be false, and then repeating these misrepresentations to the defense. For example, the defense only recently learned that contrary to the Government's representations, the defense does not have the complete SNP investigative file, containing all the crime scene photos, despite representations that the SNP had previously sent them all of them. The Government has advised that they spoke to the SNP crime scene technicians <u>for the first time</u> in mid-December, and now, they were told that there is additional photo and video evidence the SNP has not yet turned over. Weeks later, this still has not been obtained from the FBI.

- To date, this critical discovery has still not been turned over, including <u>Brady</u> evidence as addressed in (D.E. 125).

- Failing to timely submit necessary paperwork for the defense to visit the alleged crime scene in Madrid, <u>which trip still has not be arranged</u> or discussed in any constructive manner with defense counsel.

- Failing to timely obtain third-party evidence from domestic entities, such as Google and Bumble.

- Failing to timely prepare and produce expert reports, despite advising the court they know who the experts will be, there still has not been compliance with Rule 16 or 702, Federal Rules Criminal Procedure.

Indeed, the Court has admonished the Government on more than one occasion that these delays will not be accepted without assurances that, at a minimum, the Government is impressing upon its foreign counterparts that Knezevich has speedy trial rights that must be adhered to in this country. In November, prior to the Government's Motion for Continuance, the Court advised the prosecutors:

> THE COURT: . . . it is clear from the months that we have had this, that the way Spain approaches law enforcement and prosecution matters, is different from the United States. And the timelines that are imposed on courts and prosecutors here don't have the same resonance . . . **So, I think it's critical that *as often as you can you***

11

> ***convey the notion of a speedy trial*** to those persons you are coordinating with as far as evidence . . .[14]

To date, the Government has not provided the Court with any evidence demonstrating compliance with this directive. Significantly, the Court is and has been aware that <u>Knezevich does not want any delays</u> and that the delays granted thus far were at the behest of and caused by the Government. Knezevich has been in custody for over eight months, with no end in sight, prompting this renewed request for bond.

### III.   THE GOVERNMENT'S MOTION FOR CONTINUANCE IS THE BEST EVIDENCE OF ITS DELAY

The Government claims that it needs additional time to receive evidence in response to MLAT requests sent between September and November 2024 before it can be ready for trial. (*See* D.E. 121). Agent Montilla submitted a sworn declaration in support of the Motion for Continuance. (D.E. 121-1). Both the Motion and the declaration outline the evidence the Government is waiting on. Without exception, <u>it is all evidence that the Government knew or should have known it would need</u> ***before indicting*** Knezevich:

- From Italy – documents related to cell phones, license plate readers, tolls, citations, witness interviews,[15] and records certifications.

- From Croatia – documents related to cell phones, border crossings, license plate readers, tolls, citations, witness interviews, and records certifications.

- From France – documents related to cell phones.

---

[14] *See* **Exhibit E**, transcript from 11/14/24 hearing, at 12.

[15] Witness interviews surely should have been conducted prior to the indictment and not first sought eight months after arresting Knezevich and detaining him. The defense has not received any interviews conducted in Italy, nor are any referenced in any document produced in discovery.

- From Spain – access to the apartment building, IP address information for the apartment building, vehicle registration information, Ms. Knezevich's purchase information, records certifications, and an updated copy of the Spanish National Police's investigative file.

- From Serbia – documents related to border crossings, license plate readers, tolls, traffic violations, vehicle registrations, cell phone records, Knezevich's purchases and apartment rental, records certifications, and permission to interview Serbian citizens.[16]

(D.E. 121-1 at ¶¶ 9-13). The Government knew the significance of all this evidence when it charged Knezevich in May 2024, and likely much earlier than that. They have been investigating this case for almost a year since February 2024.

## IV.   THE TIME HAS COME

The Court has repeatedly warned that it will hold the Government's feet to the fire on discovery and trial dates. In October, the Court said: "You, Government, made the decision that you did at the time that you did, and so he's pretrial detained. So, now I am being told, well, it could be a year -- which I did not know that -- *and, frankly, that is a problem*." (Ex. D at 12).

Then, two months ago, in November, after the Government again sought to "move the goal posts," the Court reminded the Government:

> If there has been some misapprehension about the urgency of getting this all to the Court, and to defense counsel, in order for us to try this case, . . . ***There is going to come a point in time where ["]I don't know they have it, they won't give it to us, we don't have it ["], is just going to be insufficient*** and somebody is going to be held accountable, and/or evidence is just not going to be submitted to the jury or instructions about the lack of evidence will be given to the jury . . .

(Ex. E at 45).

---

[16] The FBI in conjunction with the Serbian government interviewed witnesses and took statements from them at the courthouse in Serbia back in May 2024, which have been provided.

Now, as of this filing, trial in this matter has again been put off, re-scheduled for June 2025 over Knezevich's objection. The Government is still investigating this case (even though it should have been prepared for trial nine months ago). As discussed at the most recent hearing on January 15, 2025,[17] the Government: (1) still does not have MLAT responses which it claims are critical for trial; (2) still has not filed a motion for approval to depose Serbian witnesses, despite putting off the trip to Madrid for that purpose, and the Court suggesting that motion be filed as soon as possible; and (3) still cannot tell the defense *where* Ms. Knezevich was allegedly murdered, the most fundamental information imaginable in a capital case, much to the disbelief of the Court which ordered that the Government provide certain expert information to the defense within 30 days. The Government was chastised, not the first time, for the lack of urgency displayed by agents and foreign law enforcement, which is having a real and prejudicial impact on Knezevich's due process rights. The Court even suggested that if foreign law enforcement does not want to cooperate, prosecution in the United States will not work.

In response to the Court's statement at the November hearing, that "Maybe we come to that [excluding evidence], but it's not now," (Ex. C at 18), the defense respectfully submits that, given the status of the case in January 2025, **the time *is* now**. The Court should revisit the propriety of keeping Knezevich detained for another 7 months at a minimum. The defense and Knezevich have no confidence, given the foregoing, that the Government will not try to push this trial even further into 2025. As now-Chief Judge Altonaga has recognized, only in rare circumstances should release be denied, and doubts regarding the propriety of release should be resolved in favor of defendants. *Kaplowitz*, at *4. In *Kaplowitz*, like here, Judge Altonaga rejected the suggestion that

---

[17] The defense has not yet obtained the transcript from that hearing.

the defendant posed a danger to the community. *Id.* at *5. The Court also found that a mere

theoretical opportunity for flight is an insufficient ground for pretrial detention. *Id*.

### VI.      KNEZEVICH'S BOND PROPOSAL

There are appropriate safeguards available to ensure Knezevich's continued presence

before the Court in this matter. In *U.S. v Jones*, 143 F.Supp.3d 78 (2015), the court held that

although defendant was a flight risk, there were still conditions of release that would reasonably

assure the defendant would appear whenever required. In *Jones,* those conditions of release

included a cash surety bond, that the defendant would report within 24 hours to probation that the

defendant would surrender his passport, and that defendant would abide by all conditions of the

Home Confinement Program to be monitored electronically in a manner approved by the court and

probation. The conditions in *Jones* should be imposed in this case. This is particularly true for the

following reasons.

First, the Court is respectfully reminded that Pre-Trial Services, an arm of the Court,

recommended that Knezevich be released on home detention pending trial.

Second, Knezevich voluntarily returned to South Florida from Serbia, where his parents

live and where he had rented an apartment for a year, to attend to business matters in the U.S. He

immediately obtained representation in this matter, to prepare a defense. For all intents and

purposes, this was a voluntary surrender, given his knowledge of the investigation.[18]

Third, the bulk of Knezevich's assets are tied up in a conservatorship, which was created

in the Circuit Court of Broward County, Probate Division, under Case Number PRC-24-0001610.

As such, Knezevich does not have access to any joint asset owned with his wife. Nor does he have

---

[18] As Judge Moore of this district once observed, "[a] defendant's voluntary surrender undoubtedly is probative of whether he or she presents a **flight risk**." *United States v. Fiandor*, 874 F.Supp. 1358, 1361 (S.D. Fla. 1995) (emphasis added).

access to any asset that was in his wife's name alone, of which there were several. Knezevich did have personal and business bank accounts at Chase, but those bank accounts have been frozen and are now part of the conservatorship. Knezevich has no access to those funds. This was corroborated by Agent Montilla's testimony. (Ex. B at 76).



Attached as **Exhibit F** is a declaration from Brooke Estren, Esq., Knezevich's real estate lawyer, who handled all Knezevich's real estate transactions, including the properties that have been discussed in Court and attributed with values that have been grossly overstated. Additionally, Ms. Estren is personally aware of all Knezevich's finances at this time, as set forth in her declaration.

Given the foregoing, Knezevich proposes the following reasonable and fair bond package, consistent with *Jones*:

1. Based on all financial disclosures, Knezevich is without means to post a substantial cash bond. He can, however, pledge his home, where he will live with the Court's permission.

2. Knezevich can be monitored by electronic home detention monitoring.

---

19 ███████████████████████████████████████████████████████
███████████████████████████████████████████████████

3. The Government has possession of Knezevich's passport.

4. The Court has asked about Knezevich's Serbian passport. Defense counsel has now obtained that passport and will turn it over to pretrial services. To the extent the Court would like an explanation as to where the passport was, the defense will willingly provide it. Suffice to say, for this filing, that the passport was in Knezevich's mother's home in Serbia the entire time. ***There was no nefarious hiding of the passport***.

5. Knezevich would execute a waiver of extradition.

6. Knezevich would abide by all the conditions of release recommended by pre-trial services, including reporting to pre-trial services, submission to substance abuse testing, participating in a mental health assessment, avoiding all witnesses, refraining from possessing a firearm, agreeing not encumber property, participating in the electronic monitoring program, and more.

The totality of these conditions guarantees the Court of Knezevich's appearance whenever required. Unfortunately, Knezevich does not have family or friends who have the means to post security with the Court. However, it is respectfully urged that the Court should consider the recommendation of pre-trial services to release Knezevich on a home confinement monitor, as well as the critical fact that Knezevich, knowing he was the prime suspect in his wife's disappearance, voluntarily returned to Miami. Knezevich has had absolutely no prior contact with law enforcement. He has always been a hardworking, law-abiding citizen since he came to this country in 2008. As part of his bond, Knezevich can also be ordered to maintain contact with probation, either by call, visit, or home visit, as frequently as the Court deems appropriate.

## MEET AND CONFER CERTIFICATION

Pursuant to Local Rule 88.8, the undersigned has conferred with the Government which objects to the relief sought in this motion.

## CONCLUSION

It is now abundantly clear that Knezevich will not be brought to trial until June 2025 at the earliest. He has been detained ever since he voluntarily returned to Miami in May 2024. Because

the Government chose to make what it now acknowledges was a "reactive arrest," Knezevich has been detained for almost nine months. By the time of trial, *if trial actually happens in June 2025*, Knezevich will have been detained for over thirteen months. Considering the Government's delays, in addition to Chief Magistrate Torres' finding that detention was a *close call*, bond is appropriate at this time. For all the reasons set forth herein, fundamental fairness begs for Knezevich's release and a reasonable bond to be set.

Dated: January 17, 2025.                                   Respectfully submitted,

**By: s/ Jayne C. Weintraub, Esq.**
Florida Bar No. 320382
**SALE & WEINTRAUB, P.A.**
2 South Biscayne Blvd.
One Biscayne Tower – 21st Floor
Miami, Florida 33131
Tel: (305) 374-1818
Email: JWeintraub@SaleWeintraub.com

**By: s/ Bruce A. Zimet, Esq.**
Florida Bar No. 0225053
**BRUCE A. ZIMET, P.A.**
1555 Palm Beach Lakes Blvd., Suite 1400
West Palm Beach, FL 33401
Tel:    (561) 508-7741
Tel:    (954) 764-7081
Email: BAZ@BruceAZimetLaw.com

**By: s/ Christopher Cavallo, Esq.**
Florida Bar No. 0092305
**NELSON MULLINS**
2 South Biscayne Blvd.
One Biscayne Tower – 21st Floor
Miami, Florida 33131
Tel: (305) 373-9465
Email: Chris.Cavallo@NelsonMullins.com